**LOCKHEED MARTIN CORPORATION,**
Appellant,

v.

**Robert M. WALKER, Secretary
of the Army, Appellee.**

**No. 97–1469.**

United States Court of Appeals,
Federal Circuit.

July 23, 1998.

Roy A. Klein, Melville, New York, argued for appellant.

William P. Donovan, Jr., Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, argued for appellee. With him on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and Kirk T. Manhardt, Assistant Director.

Before MICHEL, Circuit Judge,
ARCHER, Senior Circuit Judge, and
GAJARSA, Circuit Judge.

MICHEL, Circuit Judge.

Lockheed Martin Corporation ("Lockheed") appeals the decision of the Armed Services Board of Contract Appeals (the "Board") dated March 28, 1997. *Loral Fairchild Corp.*, No. 45719, 1997 WL 157324 (ASBCA Mar. 28, 1997). The Board sustained-in-part and denied-in-part Lockheed's appeal of the contracting officer's (the "CO's") final decision rejecting Lockheed's claim for $4,391,809 in equitable adjustments under its fixed price contract to supply missile fuses to the federal government. Although we do not disturb the Board's finding that the government-prepared technical data package was defective, we hold that, because, contrary to the terms of the contract, the government exercised its option out of sequence, the Board erred by determining that the option exercise was valid. Furthermore, we hold that the Board erred by denying Lockheed a total cost recovery at a stage in the proceeding in which only entitlement was at issue. Accordingly, we reverse-in-part, vacate-in-part, and remand.

## BACKGROUND

Lockheed (formerly known as Loral Fairchild Corporation) entered into a fixed price contract with the government on May 4, 1989 (the "Contract"), for the sale of target detection devices (the "fuses"), which are proximity fuses for use in Chaparral anti-aircraft missiles. The fuses were to be manufactured according to a technical data package of drawings and specifications (the "TDP") prepared by the government. The Contract required the government to purchase a base quantity of fuses. In addition, the Contract provided the government with options to purchase additional fuses. Specifically, Sections F.3.1 through F.3.3 of Part 1 of the Contract state:

F.3.1. If the Government chooses to exercise the options contained in CLINS [Contract Line Item Numbers] 0004–00010, it will do so in accordance with the following schedule:

| CLIN | WITHIN MONTHS AFTER AWARD |
|------|---------------------------|
| 0005 | 8 |
| 0006 | 8–18 |
| 0007 | 18–30 |
| 0008 | 30–42 |
| 0009 | 42–54 |
| 0010 | as required IAW para. H.11 |

F.3.2. The Government reserves the right to exercise the same option more than once, up to, but not to exceed the full range of that specific Line Item, and within the specified period, e.g., Line Item 0005 may be exercised twice for a quantity of

600 units each time, or three times for a quantity of 400 each time, within the eight (8) month period.

F.3.3. The intention of the Government is to exercise the options in such a manner that the production line will be operating on a continuing basis (i.e., no production breaks long enough to require a new first article test).

On April 3, 1990, the government exercised an option for 1653 fuses under CLIN 0006 and pursuant to Modification P00003, even though it had not exercised the CLIN 0005 option. Lockheed produced the option quantity but reserved its right to file a claim for equitable adjustment on the ground that all of the government's options had lapsed as a result of the government's failure to exercise the prior option in CLIN 0005 within the requisite time set forth in the Contract. Lockheed appealed to the CO on this basis. Lockheed also alleged before the CO that the TDP prepared by the government was defective, thereby causing extensive, unexpected, and costly engineering and design changes, entitling it to an equitable adjustment independent of that associated with the out of sequence option.

Lockheed initially filed a claim with the CO on December 4, 1990, for $4,391,809. This claim was dismissed without prejudice and later resubmitted by Lockheed on April 21, 1992. On December 9, 1992, the CO denied Lockheed's claim. Lockheed appealed this decision to the Board as to both grounds.

In its March 28, 1997 decision, the Board first determined that the government had validly exercised its option to purchase the fuses. *See Loral,* slip op. at 20. The Board reasoned that, although the options were priced according to a learning curve, the contractual phrase "in accordance with the following schedule" permitted the government to exercise the options within the specified time periods regardless of whether prior options had been exercised. *See id.* at 19. Furthermore, the Board determined that the use of options in the Contract was not in violation of FAR 17.202(c)(2)'s prohibition on using options where "[t]he contractor will incur undue risks" because it found the technical, cost, and schedule risks inherent in the Contract were not such undue risks "but

rather were the risks of initial commercial production of a newly developed item which [Lockheed] indeed foresaw in proposing to identify, research and analyze potential [fuse] design problems and shortcomings." *Id.* Finally, the Board ruled that Lockheed was entitled to compensation for certain technical deficiencies in the TDP. *See id.* at 21. While the Board did not adjudicate the actual *quantum* of Lockheed's equitable adjustment recovery on this second ground, it did issue a determination that Lockheed was not entitled to a recovery measured by actual costs plus a reasonable profit (a "total cost recovery"). *See id.* at 20–21. Lockheed timely appealed to this court as to both grounds.

On appeal, Lockheed argues first that the Board erred at law by determining that the government had validly exercised its option because (1) the option was improperly exercised out of sequence in violation of the terms of the Contract; and (2) including the option as a term of the Contract violated FAR 17.202 due to the defective TDP causing Lockheed "undue risks." In addition, Lockheed argues that the Board erred by denying Lockheed a total cost recovery both on the substantive ground that it was entitled to such a recovery and the procedural ground that the Board should not have reached the issue in the context of a proceeding that was expressly limited to the issue of entitlement.

## DISCUSSION

### I.

■■■ We review the Board's determinations of law *de.novo,* but its "decision on any question of fact shall be final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence." 41 U.S.C. § 609(b) (1994). Similarly, the Board's determinations on issues of contract interpretation are reviewed *de novo,* although our review is mindful of the Board's specialist expertise. *See U.S. West Communications Serv. v. United States,* 940 F.2d 622, 625 (Fed.Cir. 1991).

## II.

■ We hold that the Board's interpretation of the Contract to permit the government to exercise options out of sequence was error. Indeed, we are convinced that the only reasonable interpretation of the Contract is that it requires that the options be exercised in sequential order. As an initial matter, the express contractual language of Section F.3.1 indicates such an interpretation. Section F.3.1 permits the government to exercise its options "in accordance with the following schedule." The use of the term "schedule" in this clause followed by the table of successive time periods for exercising each successive, cheaper option, while not dispositive, indicates an intent to require option exercise in accordance with the specified sequence.

However, our conclusion that the Contract requires that the options be exercised sequentially is not so much compelled by the express language of Section F.3.1, which standing alone could perhaps be said to be ambiguous, as by Section B of the Contract which expressly sets forth the mutually agreed price structure of the options. The progressively diminishing unit prices listed in Section B demonstrate, as the Board found and the government does not appear to dispute, that the options were priced according to a learning curve. Thus, the plain language of Section B removes any possible ambiguity from the meaning of Section F.3.1. That the options were priced according to a learning curve is only further bolstered by the negotiating history of the Contract. Indeed, Lockheed's May 1988 proposal explained that "[o]ur prices . . . reflect aggressive learning and a commensurate unit price reduction for the optional quantities." *Loral,* slip op. at 4. While the magnitude or slope of this learning curve changed during the subsequent negotiations, the overall pricing structure did not. Accordingly, each successive option is priced at a lower unit price to take account of savings Lockheed could reasonably expect to realize through the additional "learning" brought about by earlier phases of its continuing program of fuse production. Pricing according to such a learning curve is relatively common in defense procurement contracts and generally leads to a price schedule which, as here, reflects lower marginal costs for the production of each additional unit or set of units. *See, e.g., Sierracin/Sylmar,* ASBCA No. 27531, 85–1 B.C.A. (CCH) ¶ 17,875, 89,549–50 (1985) (collecting cases); *see also* Jack M. Sabatino, *Privatization and Punitives: Should Government Contractors Share the Sovereign's Immunities from Exemplary Damages?,* 58 Ohio St. L.J. 175, 239 n.45 (noting "the economies of scale and organizational learning curves associated with producing specialized equipment for the military").

Because Section B indicates that the options were priced according to a learning curve, the Contract, when read as a whole, can only be reasonably interpreted to require that the options be exercised in sequence. The lower marginal costs achieved at the latter extremities of the learning curve are only achieved because of the "learning" that took place during earlier performance. As the Board itself has previously explained, "[t]he general theory of learning curves is that with repetitive tasks involving a considerable amount of labor, the speed or efficiency with which the task is performed increases as the number of units of the work increases." *Texas Instruments, Inc.,* ASBCA No. 25942, 88–1 B.C.A. (CCH) ¶ 20,421, 103,303 (1987). To permit the government to take advantage of the price benefits of the latter parts of the learning curve without first enduring the more costly earlier stages would be to permit the government to reap that which it did not sow. Such an arrangement would not have been agreed upon by competent parties pricing a contract according to a learning curve and, consequently, we decline to interpret the Contract as permitting out-of-sequence option exercise. Thus, we agree with the rationale of the Board's decisions in both *Texas Instruments* and *Motorola, Inc.,* ASBCA No. 39782, 93–3 B.C.A. (CCH) ¶ 26,081, 129,-626 (1993), that, unless the parties expressly contract otherwise, where options are priced according to a learning curve with progressively lower unit costs for successive options, an option cannot be validly exercised unless all prior options have been timely and validly exercised.

The government, however, argues that Section F.3.3 demonstrates that the Contract permits the options to be exercised out of sequence. Section F.3.3 states that "[t]he intention of the Government is to exercise the options in such a manner that the production line will be operating on a continuing basis (i.e., no production breaks long enough to require a new first article test)." The government asserts that this clause indicates that the parties expressly agreed that production would be continuous and, therefore, did not implicitly agree to the additional requirement that each option be exercised sequentially. We do not read this clause as prohibiting any such agreement. Rather, Section F.3.3 may simply be interpreted to obligate the government to exercise its options in a manner that would not lead to Lockheed being required to produce a new first article test. Because of the duration of the option periods in Section F.3.1, it is conceivable that the government could exercise successive options as much as two years apart. We read Section F.3.3 merely as addressing this risk faced by Lockheed, rather than as implying that the options need not be exercised sequentially.

The government further argues that the parties could not have intended to require that the options be exercised in succession because the option exercise periods apparently overlap with one another. It points out that the option exercise periods in Section F.3.1 are scheduled for, *inter alia*, "8," "8–18," "18–30," "30–42," and "42–54" months after the award of the Contract. We do not agree that Section F.3.1 creates overlapping option exercise periods and so demonstrates an intent to permit non-successive exercise of the options. Indeed, contracting for overlapping option exercise periods would be self-defeating for the contractor given that the government would always choose to exercise the least expensive of the two otherwise identical options. Thus, while the precise timing requirements of the option exercise periods are not before this court and need not be addressed, it suffices for purposes of this appeal to note that the option exercise periods do not overlap. Accordingly, the schedule of option exercise periods set forth in Section F.3.1 does not indicate an intent to permit non-successive option exercise.

Because we hold that the Board erred by determining that, despite the government's failure to exercise option CLIN 0005, the government validly exercised option CLIN 0006, we need not address Lockheed's argument that inclusion of this option in the Contract contravened FAR 17.202.

## III.

Lockheed argues that the Board erred by determining that it was not entitled to a total cost recovery as damages for the defective TDP. Lockheed contends that it is entitled to a total cost recovery because it satisfied the requirements for a total cost recovery set forth in *Servidone Construction Corp. v. United States*, 931 F.2d 860, 861 (Fed.Cir.1991), or, alternatively, because it satisfied the requirements of the doctrine of superior knowledge, *see Hercules Inc. v. United States*, 24 F.3d 188, 196 (Fed.Cir. 1994), *aff'd*, 516 U.S. 417, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996). Moreover, Lockheed further asserts that the Board erred by even issuing a determination on the total cost recovery issue because the hearing before the Board was expressly limited to the question of entitlement.

We agree with this latter contention and, therefore, vacate that part of the Board's decision denying Lockheed a total cost recovery. The hearing before the Board was expressly limited to the question of entitlement. *See Loral*, slip op. at 1 ("The Board is to decide entitlement only."). Consequently, the parties had no opportunity to present written or oral arguments to the Board regarding the *quantum* of damages or the appropriate method for measuring damages. Thus, given the bifurcated nature of these proceedings, it was error for the Board to issue a determination on *quantum* during the entitlement phase. While we must, therefore, vacate the Board's determination that Lockheed was not entitled to a total cost recovery, we express no view on whether a total cost recovery or any other measure of damages is the appropriate method for determining *quantum* in this case. Such questions must necessarily be decided after an appropriate hearing on remand.

## CONCLUSION

Because the government could not validly exercise its options under the Contract out of sequence, we reverse the Board's determination that the government validly exercised option CLIN 0006. Furthermore, because the Board's determination that Lockheed was not entitled to a total cost recovery relating to the defective TDP was issued during the entitlement phase of the proceedings, that part of the Board's decision is vacated. Finally, we do not disturb the Board's finding that the TDP was defective. Accordingly, we

*REVERSE–IN–PART, VACATE–IN–PART,* AND *REMAND.*

## COSTS

The government to bear costs.