NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2025 VT 21

No. 23-AP-336

| | |
|---|---|
| In re State Airport Hangar Lease Disputes (Scott Winick et al., Appellants) | Supreme Court |
| | On Appeal from Vermont Transportation Board |
| | September Term, 2024 |

David C. Coen, Chair

Scott R. Winick, Pro Se, Jay, for Plaintiffs-Appellants.

Charity R. Clark, Attorney General, Montpelier, and Jeffrey P. Sokolik, Assistant Attorney General, Barre, for Defendant-Appellee.

PRESENT: Reiber, C.J., Eaton, Cohen and Waples, JJ., and Dooley, J. (Ret.), Specially Assigned

¶ 1. **DOOLEY, J. (Ret.), Specially Assigned.** This appeal concerns an increase in airport-hangar lease rates at state-owned airports. In 2019, the Agency of Transportation (AOT) raised the rental fees for tenants' hangar space. Five tenants appealed to the Transportation Board, arguing that that the rent increase did not comply with the terms of their leases and was arbitrary. The Board rejected their arguments, and tenants appealed. We affirm the Board's conclusion that AOT was permitted to consider changes to market value and maintenance costs outside of the prior lease term in setting rents, but reverse and remand its decision concerning the fairness of the rent increases.

¶ 2.     Tenants own hangar facilities constructed on land leased from AOT at the Northeast Kingdom International Airport and the Stowe-Morrisville State Airport.  Each of tenants' leases contains a clause empowering AOT to adjust the amount of rent due upon renewal of the lease. Tenants Sims, Winick, and Gauvin[1] have identical lease provisions:

> At the end of the first two-year period, and at the end of each succeeding two-year period, the STATE may adjust the amount of rent to reflect any increase for the Consumer Price Index for All Urban Consumers (CPI-U) over the previous two years, current market value for the land, and the maintenance costs for the airport.

The leases of tenants Macfarlane and the Morrisville-Stowe Hangar Association use nearly identical language but vary in the stated time periods for both the lease term and the "lookback" period for rent increases.  Tenant Macfarlane's operative lease provides for rent increases "at the end of the first _five_-year period and at the end of each succeeding _five_-year period," to reflect an increase in the CPI-U "over the previous _five_ years, current market value for the land and the maintenance costs for the airport."  (Emphases added.)  The Association's lease also varies in the time periods listed.  It provides for rent increases "at the end of the first _two_-year period, and at the end of each succeeding _two_-year period," to reflect an increase in the CPI-U "over the previous _five_ years, current market value for the land, and the maintenance costs for the airport."[2] (Emphases added.)

---

[1]  Tenant Gauvin appears to have, in addition to the lease agreement under his own name, another lease agreement.  Gauvin was the signatory for the lease between Lakeview Aviation and the State.  It is not clear whether he brings his claims under his own name or that of Lakeview Aviation.  Regardless, the terms of both leases are identical.

[2]  The Board appears to have located another differently phrased lease provision.  Our review of tenants' leases did not reveal that other lease provision.  The other lease provision did not alter the Board's analysis.  We limit our review here to tenants' leases as they appear in the record on appeal.

¶ 3.    On July 1, 2019, AOT increased the amount of annual rent from $0.12 to $0.25 per square foot for hangar leases at the Northeast Kingdom International Airport and from $0.16 to $0.25 per square foot at the Morrisville-Stowe State Airport.  The 2019 adjustment was the first rate adjustment for the Northeast Kingdom International Airport since 2008.

¶ 4.    In accord with their leases' dispute-resolution process, tenants appealed the rate increases first to AOT and then to the Transportation Board.  The Board consolidated tenants' appeals in January 2023.   Tenants and AOT filed administrative records and memoranda supporting their positions.

¶ 5.    Before the Board, tenants argued that AOT failed to comply with the lease terms governing rate increases.  Tenants did not dispute that the lease agreement allowed AOT to consider the CPI-U, the fair market value of the airport property, and airport maintenance costs. But they argued that the lease term restricted the period during which AOT could consider changes to those factors, and that AOT did not so limit its review.  Tenants also argued that the rate increase was arbitrary and capricious and unsupported by AOT's administrative record.

¶ 6.    The Board made the following findings of fact.[3]  Between 2008 and 2019, AOT invested more than $10 million in improving the Northeast Kingdom International Airport, including constructing a full-length parallel taxiway, snow-removal equipment garage, and an AVGAS/Jet A fuel farm, as well as lengthening the runway by 1000 feet.  Improvements made to the Morrisville-Stowe State Airport between 2017 and 2023 included rebuilding and extending the runway, constructing a parallel taxiway, paving the runway-safety areas, procuring both loading and snow-removal equipment, and hiring a full-time maintenance employee.  The administrative record before the Board did not include the cost of the improvements to the Morrisville-Stowe airport.

---

[3]  As discussed below, there was no evidentiary hearing in the Board proceeding.  While the Board referred to findings of fact, we question that description.

¶ 7.    Before the 2019 rent increase, the state collected approximately $20,000 in rent at the Northeast Kingdom International Airport to offset around $236,000 in annual operating costs, for a coverage rate of approximately 8.8%. That coverage rate was among the lowest of any state-owned airport.

¶ 8.    To update rental rates, AOT conducted a market-value analysis for leased space in its state-owned airports and consulted with the Vermont Aviation Advisory Council (VAAC).[4] The analysis looked at comparator properties in the region with similar characteristics, including airport size and aircraft capacity, the presence of navigational aids, maintenance services, runway length, type and number of facilities, and surrounding population. The Board found, however, that "[d]etails of this analysis were not included in the administrative record." The VAAC, charged with making recommendations to state officials regarding aviation policy and airport investment, supported the rate increases in a nonbinding vote after holding public meetings in 2018.

¶ 9.    The Board concluded that the plain language of the lease agreements contemplated the rent increases. It disagreed with tenants' arguments that the lease language limited any consideration of changes in market value or improvement costs to the previous lease period, noting that the restriction on the lookback period was only applicable to a change in CPI-U. The Board also concluded that AOT adequately demonstrated that it relied on proper factors in fashioning the rent increases but admonished it to offer "a more clear and direct analysis" between the rate increase and the factors on which it relied to support the rate increase in the future.

---

[4] The VAAC was created by an executive order of Governor James Douglas on August 5, 2003. See 3 V.S.A. App. No. 11-03, Executive Order No. 5-4 (Aug. 5, 2003). While the order does not explicitly authorize the VAAC to provide input on hangar-rent rates, the VAAC's responsibilities are broad.

¶ 10.    Tenants appealed as a group to this Court.[5]  See 19 V.S.A. § 5(c) (stating that, except for final orders on small claims against AOT, "final orders of the Board may be reviewed on the record by the Supreme Court").

II.

¶ 11.    Before addressing the merits of tenants' appeal, we note two areas where context is helpful to understanding the issues.

¶ 12.    The first is that there are essentially two appeals involved in this case because the applicable statute provides different grounds for appeal.  The first ground is contained in 19 V.S.A. § 5(d)(4), which gives the Board appellate jurisdiction over AOT contract disputes and applies to tenants' argument concerning the proper interpretation of the lookback provision.  See 19 V.S.A. § 5(d)(4) (stating Board shall "provide appellate review, when requested in writing, regarding legal disputes in the execution of contracts awarded by the Agency . . . to advance projects in the State's Transportation Program"); Earth Constr., Inc. v. State Agency of Transp., 2005 VT 82, ¶ 6, 178 Vt. 620, 882 A.2d 1172 (mem.) (explaining that § 5(d)(4) review includes disputes involving breach of contract).  Tenants' argument that the lookback period adopted by AOT and the Board is too long falls under this appeal ground because tenants argue that AOT has breached the lease contracts.  See 19 V.S.A. § 5(d)(4).

¶ 13.    The second ground is contained in 19 V.S.A. § 5(d)(6), which states the Board shall "provide appellate review when requested in writing, regarding the fairness of rents and fees charged for the occupancy or use of State-owned properties administered by the Agency."  On this ground, tenants argue that the rental rate increases are unfair because AOT's computation of rental

_____

[5] Tenant Macfarlane raised individual arguments before the Board.  It appears he does not challenge the Board's holdings pertaining solely to him on appeal.

5

rate increases was arbitrary and capricious in a case where there is no ascertainable methodology for calculating the level of the increases. [6]

¶ 14. This brings us to the second area of context. In Luck Bros. v. Agency of Transportation, 2014 VT 59, 196 Vt. 584, 99 A.3d 997, this Court established the proper procedures and the standard of review for appeals to the Transportation Board from AOT. Neither party cited the decision in their memorandum to the Board, but the Board cited it and tenants cited it in their brief as establishing the standard of review for the Board's review and the review in this Court. AOT included it in its list of citations. However, neither the Board nor AOT addressed that decision's requirements as they applied to this case. As we discuss below, the result is that there are serious issues of compliance with the requirements of Luck Bros.

A.

¶ 15. We start with the alleged violation of § 5(d)(4). Tenants first challenge the time frame applied by AOT in considering whether to increase rates. Tenants acknowledge that the leases allowed AOT to increase rates upon lease renewal based on three factors: the CPI-U, the fair market value of the airport property, and airport maintenance costs. However, tenants argue that the Board erred in construing the lease terms to allow AOT to consider changes in fair market

---

[6] Tenants also argue that the level of increase is too large, reaching over 100% for one of the airports. The question of how much to raise the rent is fundamentally a policy issue that is not appropriate for resolution by a court. Absent any guidance from rule or statute about how rent increases are to be decided, "fairness" is essentially a nonstandard. See In re Pro. Nurses Serv. Application for Certificate of Need, 2006 VT 112, ¶¶ 14-16, 180 Vt. 479, 913 A.2d 381 (observing that statute governing certificate-of-need applications did not require agency to develop record as in contested case, limit hearsay, or allow witnesses to be cross-examined, which "does not lend itself to meaningful judicial review"). Where large increases in rents are occurring because more frequent smaller increases have not occurred, the situation here, the result is that the landlord has lost significant revenue over time to the inevitable rent increase that the tenant will have to pay. Whether smaller and more frequent increases are more fair than less frequent and larger increases is highly debatable and clearly a matter of policy. See Plum Creek Maine Timberlands, LLC v. Vermont Dep't of Forests, Parks & Recreation, 2016 VT 103, ¶ 25, 203 Vt. 197, 155 A.3d 694 (explaining that "agency determinations regarding the proper interpretation of policy or methodology within the agency's expertise are entitled to deference"). We do not consider this argument.

6

value and airport improvements that occurred outside of the previous lease term in setting the new rate.

¶ 16. Contract interpretation is a question of law that we review de novo, although "we are mindful of and give some weight to the Board's specialized expertise" in analyzing government contracts. W.M. Schultz Constr., Inc. v. Vt. Agency of Transp., 2018 VT 130, ¶ 32, 209 Vt. 146, 203 A.3d 1205 (quotation omitted). When a contractual provision is clear and unambiguous, we construe the provision as a matter of law. City of Newport v. Vill. of Derby Ctr., 2014 VT 108, ¶ 6, 197 Vt. 560, 109 A.3d 412. A contract term is unambiguous if it "fairly admits of but one interpretation." Sutton v. Purzycki, 2022 VT 56, ¶ 37, 217 Vt. 326, 295 A.3d 377 (quotation omitted). When lease terms "are plain and unambiguous, they will be given effect and enforced in accordance with their language." KPC Corp. v. Book Press, Inc., 161 Vt. 145, 150, 636 A.2d 325, 328 (1993).

¶ 17. The plain language of the lease agreements is unambiguous and contradicts tenants' proposed construction. As noted above, tenants' leases have nearly identical provisions governing rent increases that vary only in their stated time periods. The lookback period in the leases—referencing "the previous [two or five] years"—limits only the CPI-U factor:

> At the end of the first [two or five]-year period and at the end of each succeeding [two or five]-year period the STATE may adjust the amount of rent to reflect any increase for the Consumer Price Index for All Urban Consumers (CPI-U) over the previous [two or five] years, current market value for the land, and the maintenance costs for the airport.

¶ 18. Rate increases due to changes in the current market value for the land and the maintenance costs for the airport are not limited by the lookback period. The drafter of the leases clearly contemplated the two- or five-year lookback to be solely applicable to considerations of CPI-U, rather than to the market-value or maintenance-cost factors. The Board found that this limitation "makes sense, given that the CPI-U is updated annually, and thus easily shows changes

7

during the prior . . . lease term, whereas a change in fair market value requires a detailed analysis that may not be undertaken on an annual, two-year, or five-year basis." Tenants' proffered interpretation that the temporal limitation clause applies equally to the factors before and after the clause is not supported by the plain language of their contracts.

¶ 19. Tenants urge us to find the lease ambiguous and to consider the State's virtual monopoly and control over the hangar space, the purported absurdity of allowing the market-value or maintenance-cost factors for a rent increase to be temporally unrestricted, and other factors. Because the lease provision is unambiguous, we decline tenants' invitation to modify it based on extrinsic evidence. Downtown Barre Dev. v. C & S Wholesale Grocers, Inc., 2004 VT 47, ¶ 8, 177 Vt. 70, 857 A.2d 263 (explaining that we may "consider the circumstances surrounding the making of [an] agreement in determining whether its provisions are ambiguous" but "those circumstances may not be used to vary the terms of an unambiguous writing" (quotation omitted)). We therefore affirm the Board's decision that AOT is not limited to considering changes in market value and maintenance costs within the prior lease term.[7]

B.

¶ 20. We next turn to the alleged violation of § 5(d)(6). Tenants argue that the Board erred in concluding that the rent increases were fair. They argue that AOT's computation of rental rate increases was arbitrary and capricious because there is no ascertainable methodology for calculating the level of the increases.

¶ 21. The Board's decision "is entitled to great weight with respect to matters within its particular area of expertise." W.M. Schultz Constr., Inc., 2018 VT 130, ¶ 32 (quotation omitted); see also Luck Bros., 2014 VT 59, ¶ 25 (describing expertise of Transportation Board). "However,

---

[7] The dissent argues that we have not explained how we are able to review the contract construction issue under § 5(d)(4) where the Board did not follow Luck Bros. with respect to the record. Post, ¶ 41 n.10. As we state above, the contract construction issue is a matter of law, not fact, that does not turn on the content of the agency record.

8

deference to an agency's decisions within its area of expertise is not absolute and will not be afforded if the agency fails to provide sufficiently clear guidance on the issue or if the agency's decision is not rational." Wood v. Wallin, 2024 VT 21, ¶ 16, __ Vt. __, 316 A.3d 266.

¶ 22.    We explained how the Board's appellate review of AOT decisions is supposed to work in Luck Bros.  There, the issue presented was whether a contractor in a contract dispute with AOT could go directly to superior court without presenting its claim first to an internal-review process within AOT and, if the contractor did not receive an acceptable result in the internal process, presenting it to the Board.  The contractor argued that neither the internal process nor the Board's appellate review provided it with constitutionally required due process of law.  With respect to the internal process, the contractor alleged that the internal reviewers were biased.  With respect to the Board process, the contractor argued that because the Board's review was conducted using the record developed by AOT and required the Board to extend deference to the AOT determination, it was fundamentally unfair.  This Court held that exhaustion of administrative processes was required both with respect to the AOT internal review and the Transportation Board appeal process.  Luck Bros., 2014 VT 59, ¶ 10.

¶ 23.    Although not central to our ultimate decision, in Luck Bros., we defined the nature of the Board appeal pursuant to its statutory mandate to "provide appellate review."  19 V.S.A. § 5(d)(4).  We described the Board appeal as "essentially de novo review" and "nondeferential." Luck Bros., 2014 VT 59, ¶ 27; see also id. ¶ 30 (the Board "must apply a de novo, nondeferential standard of review to the Agency dispute-resolution decisions").  We noted that "the statute explicitly empowers the Board to hold evidentiary hearings, to issue subpoenas for the testimony of witnesses or the production of evidence, to make findings, to issue orders and decrees, and to render judgments."  Id. ¶ 26.

¶ 24.    In this case, the Board recognized the applicability of Luck Bros. to the § 5(d)(4) claim but it is unclear whether it applied Luck Bros. to the § 5(d)(6) claim.  In fact, if it did not

9

apply Luck Bros., it decided the § 5(d)(6) claim adversely to tenants without assigning a standard of review to that claim. We need to correct that omission. For the following three reasons, we conclude that the standard of review for the § 5(d)(6) claim is that described in Luck Bros.

¶ 25. The most obvious reason is that the Legislature used the same words to describe the nature of the § 5(d)(4) claim and the nature of the § 5(d)(6) claim even though they involve different grounds. Subsection 5(d) of Title 19 contains thirteen different specific duties and responsibilities of the Transportation Board. Five of the specified duties and responsibilities, including those in § 5(d)(4) and § 5(d)(6), start with the words "provide appellate review," indicating the nature of the duty. At least two other itemized duties involve appeals from agency action but use different wording. See id. § 5(d)(1) (stating Board shall "hear appeals from Agency decisions and rulings regarding measurement, description or reclassification of town highways pursuant to section 305 of this title"); id. § 5(d)(13) (stating Board shall "hear and determine disputes involving a determination of the Agency under section 309c of this title that the municipality is responsible for repayment of federal funds required by the Federal Highway Administration"). In addition, one other itemized duty, again using different language, involves an appeal from a town selectboard with respect to snow plowing. Id. § 5(d)(9) (stating Board shall "hear and determine disputes" involving selectboard decisions regarding plowing).

¶ 26. The point here is that the Legislature was able to distinguish standards of review when it sought to use them. It reinforces our conclusion that when the same general description of the nature of review is used, the Legislature intended the same standard of review. See Galkin v. Town of Chester, 168 Vt. 82, 87, 716 A.2d 25, 29 (1998) ("We will read operative sections of a statutory scheme in context and the entire scheme in pari materia." (quotation omitted)).

¶ 27. While the above point supporting the application of the Luck Bros. standard of review to this case is the most obvious, it is not the most important. In addition to itemizing the Board's specific duties and responsibilities, 19 V.S.A. § 5 contains powers and responsibilities of

the Board that are applicable to all Board cases.  See id. § 5(c), (f).  The Luck Bros. opinion

described these powers and their effect:

> The Agency also asserts . . . that the enabling legislation plainly
> accords the Board only limited on-the-record "appellate review."
> See 19 V.S.A. § 5(d)(4) (stating that Board shall "provide appellate
> review . . . regarding legal disputes in the execution of contracts
> awarded by the agency").  We disagree.  Appellate courts normally
> apply a "nondeferential on-the-record standard of review . . . to
> lower court determinations regarding questions of law or mixed
> questions of law and fact."  State v. Madison, 163 Vt. 360, 371, 658
> A.2d 536, 543 (1995).  By contrast, nothing in the enabling statute
> here restricts the Board's review to the record produced in the
> Agency.  Indeed, to the contrary, the statute explicitly empowers the
> Board to hold evidentiary hearings, to issue subpoenas for the
> testimony of witnesses or the production of evidence, to make
> findings, to issue orders and decrees, and to render judgments.  See
> 19 V.S.A. § 5(c), (f).  When the record from the Agency is
> insufficient for the Board to make an informed decision, it may
> enhance the record to accomplish that end.
>
> Thus, the enabling statute establishes a standard of review
> somewhere in between a de novo hearing that treats the agency
> decision as nonexistent and "usual appellate review, since the board
> may evaluate evidence in record form, as well as receive direct
> testimony."  In re Wheelock, 130 Vt. 136, 140, 287 A.2d 569, 572
> (1972) (describing review by Employment Security Board as set
> forth in 21 V.S.A. § 1344); see Madison, 163 Vt. at 368-69, 658
> A.2d at 542 (noting that courts and commentators have
> distinguished between terms "hearing de novo" or "trial de novo"
> and term "review de novo").  Review before the Transportation
> Board, although it does not necessarily involve a full-blown hearing
> and does not treat the Agency's decision as if it did not exist, is
> essentially de novo review.  See Madison, 163 Vt. at 370, 658 A.2d
> at 543 (defining term "review de novo" as "a nondeferential review
> that generally relies on, but is not restricted to, the record"); 3 C.
> Koch, Administrative Law and Practice § 10.2, at 18 (2d ed.1997)
> (stating that de novo judicial review of agency decision is usually
> based on original administrative record).

Luck Bros., 2014 VT 59, ¶¶ 26-27.  This rationale applies to § 5(d)(6) appeals because § 5(c) and

(f) apply to § 5(d)(6) appeals.  The point is that the general powers and responsibility of the Board

apply to all authorized appeals and form the basis for the scope of review we determined in Luck

Bros., irrespective of the agency action being appealed.

¶ 28. The third reason is particularly important in this case. 19 V.S.A. § 5(h) requires an appeal to be filed with the Secretary of Transportation and accompanied by AOT's record of decision. As explained below, our resolution of this appeal is based on AOT's noncompliance with the last phrase of § 5(h) using the definition of the record contained in <u>Luck Bros</u>. Even if the standard of review were different from that required in <u>Luck Bros.</u>, the requirement of a compliant record would be the same.

¶ 29. The dissent argues that the scope of review for § 5(d)(6) appeals should be different from that for § 5(d)(4) appeals because the appeal issues are different, see <u>post</u>, ¶ 41 ("[T]he distinct nature of these two kinds of claims requires different approaches"), and because § 5(d)(6) appeals are not amenable to de novo review. The dissent also argues that because tenants did not offer testimony to the Board, the fact that the statute contains the ability to provide new evidence should not determine the standard of review. See <u>post</u>, ¶ 46. <u>Luck Bros.</u> is clear that neither of these points are relevant to the determination of the standard of review for § 5(d)(6) appeals. The standard of review is derived from the adjudicatory powers of the Board, not how they are used in an individual case, and the determinative powers are statutory and available in every type of appeal case.[8]

¶ 30. It would be difficult for us to find that the procedure in this case complied with <u>Luck Bros.</u> The Board appointed one of its members as the hearing officer, and he asked for memoranda from the parties to include a statement of position on whether the case could be

---

[8] The dissent argues that the establishment of rents and fees is a policy determination on which AOT has specialized expertise and, therefore we should give deference to its determination. See <u>post</u>, ¶ 44. The standard of review is ultimately a legislative determination, and in this case, the Legislature has specifically authorized a special appeal to the Board and this Court from an agency determination. We read the Legislature's assignment of responsibility as relying on the expertise of the Board, rather than that of the agency. The dissent also argues that this decision requires the Board to take de novo testimony once it receives a full agency record. See <u>post</u>, ¶ 46. This decision does not impose such a requirement.

decided on summary judgment. It is unclear what happened to the summary-judgment question, and AOT apparently rejected that option because it submitted pre-filed testimony from a staff person responsible for administering hangar leases.[9] Both sides submitted memoranda. There was no in-person hearing, and thus no testimony or evidence was presented. The hearing officer made no report to the full Board. The Board's review was deferential. Not surprisingly, AOT does not cite or discuss Luck Bros. in its brief to this Court.

---

[9] The introduction of summary judgment into the case is an example of the procedural uncertainties. The procedures for Transportation Board case adjudication are available online. General Rules Applicable to All Proceedings Before the Board, Code of Vt. Rules 14 010 002, http://www.lexisnexis.com/hottopics/codeofvtrules. They state that certain of the Vermont Rules of Civil Procedure are applicable to contested cases, but the list does not include Rule 56, which authorizes and regulates summary judgment. Even if the list included summary judgment, it would not apply because the list applies only to contested cases, and appeals created in §§ 5(d)(4) or 5(d)(6) are not contested cases because there is not an opportunity for a hearing at the AOT level. See 3 V.S.A. § 801(b)(2). Further, in a case where so much information was offered as part of the AOT record, it is difficult to determine what is a fact and what is not.

Even if summary judgment was applicable, the Board made factual findings with no hearing. This procedure particularly failed to resolve a continuing dispute over a statement allegedly made at a meeting of an AOT representative, Trini Brassard, with some of the tenants. Tenants alleged that the AOT representative said that there was no connection between the spreadsheets showing hangar-rental rates in state-owned airports in Vermont and surrounding states, and information on those airports, and the new hangar-rental rates at issue in this case. At tenants' request an audio capture of the content of the meeting was created, and tenants were promised a copy of the content. Tenants tried for a year to obtain the promised content copy, but AOT never produced it, finally admitting that AOT staff could not find it.

The story continued. In February of 2023, the Board issued a scheduling order requiring the parties to submit a memorandum on their position by April 26. As a supplement to their memorandum, tenants recounted the alleged content in the lost recording and said they had three persons who could testify to that content. They argued that AOT had relied on the spreadsheet information as showing the level of the new rates were fair, and the statement proved otherwise.

In their reply memorandum, tenants moved to strike the prefiled testimony of Trini Brassard. One part of the testimony was filed with AOT's memorandum, and another part with the AOT rebuttal memorandum. Tenants added that if summary judgment were not used, without exception, they moved to take a deposition under oath of Trini Brassard. The Board never responded to proposed testimony of tenants or mentioned the dispute. Neither did it respond to the motion to strike or to take the deposition. With respect to the content tenants sought, the decision of the Board stated: "details of the analysis were not included in the administrative record." With respect to the testimony of Trini Brassard, the Board said the prefiled testimony is "not significant to this decision," but is "proper," and refused to strike the testimony.

13

¶ 31. We cannot, however, act on the process and standard-of-review deficiencies unless they were raised before the Board. Tenants were represented by a hangar tenant who was a self-represented litigant acting for himself and for all tenants who were part of the appeal to the Board and to this Court. Not surprisingly, he was apparently unaware of the requirements of Luck Bros. With one large exception, tenants failed to raise issues on how the Board conducted the proceeding. In order to find preservation, we must find that tenants raised the issue with sufficient specificity to alert the Board to their argument. See Pratt v. Pallito, 2017 VT 22, ¶ 16, 204 Vt. 313, 167 A.3d 320 ("[T]o properly preserve an issue, a party must present the issue to the administrative agency with specificity and clarity in a manner which gives the agency a fair opportunity to rule on it." (quotation and alteration omitted)).

¶ 32. Tenants sought disclosure of the process that AOT used to arrive at the rent increases announced to them on July 1, 2019, on multiple occasions. In their memorandum to the Board, they asserted that AOT had not provided them with any information connecting the lease factors to the specific rent increases at each airport, despite their repeated requests. According to tenants, an AOT representative admitted during a December 2020 meeting that there was no connection between the market analysis and the rates set at their airports. Tenants argued: "In summary, in spite of [AOT's] best efforts over a period of years to convince hangar owners/developers otherwise, there was no rational, defensible contractual explanation or economic algorithm with which to explain the 108% increase within the context of the terms of the Lease Agreement." They made the same request and argument to this Court in their brief, arguing:

> In fact, AoT/VTrans acknowledged that the new rates were arbitrary, capricious, meaning that the rates were not transparent. There were no formulas for derivation of the rates from the data that was presented in numerous forums, including the meeting held on December 10, 2020. . . . The Transportation Board acknowledged there were no actual calculations made to determine and allocate the increases based on the data presented ad nauseum. AoT/VTrans

14

simply made them and assigned them with an implausibly thin veneer of pseudo-data.

As a result, neither Transportation Board or AoT/VTrans were able to support the rate increases with facts, but rather, presented stacks of un-related, irrelevant, uncorrelated data, which, by their own admission, bore no relationship to the final resulting, huge increases to the land lease rates at state-owned airports across the entire State of Vermont.

¶ 33. Their overall objection is that the methodology for determining the rent increase amounts is not transparent and, to the extent there was some disclosure, it shows that there is no defensible methodology. In the words of tenants, AOT "made up" the rent levels. This argument adequately preserved the questions regarding sufficiency of the record and transparency.

¶ 34. The Board recognized at the beginning of its decision that under § 5(d)(6) it had to review whether the increase and its amount was fair. However, it focused primarily on the contract-interpretation issue discussed above. Although it purported to be applying a de novo standard of review to that issue, it did not clearly describe the standard of review it was using to review the fairness of the rent increase. In a cursory paragraph, the Board found that AOT based its rent decision on the factors in the leases—increases in the CPI-U, in the value of airport land, and in the maintenance costs—as well as an analysis of rent levels in similar airports in the region, including some in other states, but stated that the Board did not have the detail to show how these factors were connected to the rent levels chosen. Despite the lack of information, the Board affirmed the rent levels, stating: "We further conclude, based on a review of the record, that AOT here based its rate increases on the proper factors, as authorized by the plain language of the leases. As such, the Board sees no basis to invalidate them." However, it added: "That said, the Board cautions AOT that, in the future, it should provide a more clear and direct analysis showing the relationship between its rate increase and the factors on which it relied." A reading of the Board's full decision makes inescapable the conclusion that it did not base its decision on the 19 V.S.A. § 5(d)(6) issues on de novo review and it deferred to AOT in reaching its decision.

15

¶ 35.  The most important point about this part of the appeal to the Board is that the appeal is from letters sent to tenants on July 1, 2019, imposing new hangar-lease rates, not from the many skirmishes that were set off by the letters.  The record for purposes of the appeal is the actions within AOT that resulted in these July 2019 letters.  That complete record was never supplied, and the process of how the new rental amounts were arrived at within AOT is a black box.  Of the 5000-plus pages of "record" filed by AOT, only a small part deals with events occurring prior to the date of the letters to the hangar tenants—essentially only the brief minutes of the two VAAC meetings where the proposed rate increases were discussed, the prefiled testimony of Trini Brassard, Assistant Director of Policy, Planning and Intermodal Development at AOT, raw data on hangar-rent rates in airports in Vermont and the "Vermont region," and some information on investments in airport improvements in some Vermont airports.  The record did not include information on how the raw data was related to the rent increases that occurred on July 1, 2019.

¶ 36.  The Board stated that Brassard's prefiled testimony was not significant to its decision.  About the only significant facts we can learn from the VAAC minutes are that AOT proposed the rent increases in the amount adopted, a majority of the VAAC members approved the proposal, and the rent levels were based in part on lease rental rate levels in airports in Vermont and other states.

¶ 37.  The Board should not have issued a decision on the fairness of the rates based on an incomplete record.  Rather, as we explained in Conservation Law Foundation v. Burke, it should have ordered the agency to present more evidence in the form of internal documents and, if necessary, testimony by agency officials.  162 Vt. 115, 128, 645 A.2d 495, 503 (1993).  In Burke, we held that it was improper for the trial court to reverse the Agency of Natural Resources' decision granting an air-pollution control permit for a medical-waste incinerator on the ground that the agency record was inadequate to support its decision.  Id.  We agreed that the record was incomplete because it contained no documents pre-dating the proposed permit, such as the permit

16

application or the air-pollution studies relied on by the agency. Id. However, we explained that the proper approach for the trial court was to deny summary judgment and seek the full record. Id. at 128-29, 645 A.2d at 503. We explained:

> Because of its nature, it will be true that the rationale for agency action based on informal adjudication will often be inadequately explained. Thus, the court may require the administrative officials who participated in the decision to give testimony explaining their action. The purpose of this evidence is to determine whether the agency considered all relevant factors or fully explicated its course of conduct or grounds of decision.

Id. at 129, 645 A.2d at 503 (quotations and citation omitted).

¶ 38.    In Luck Bros., we relied on Burke in explaining the content of the record in the context of an appeal to the Transportation Board: "[T]he record on review by the Transportation Board is not necessarily limited to that submitted by the Agency, but rather 'consists of all documents and materials directly or indirectly considered by agency decision-makers,' including 'all documents considered by the agency employees whose input reached the decisionmaker.' " 2014 VT 59, ¶ 32 (quoting Burke, 162 Vt. at 127, 645 A.2d at 502); see also GP Burlington S., LLC v. Dep't of Taxes, 2010 VT 23, ¶ 16, 187 Vt. 421, 996 A.2d 180 (noting that "it would be practically impossible" for court to review agency action without benefit of complete agency record); Brattleboro Mem'l Hosp. v. Dep't of Banking, 172 Vt. 630, 631, 782 A.2d 1217, 1219 (2001) (mem.) (reversing and remanding agency decision asserting certificate-of-need jurisdiction over hospital project due to inadequate agency record because "[i]n essence, the parties ask us to apply their respective conflicting statutory interpretations of relevant portions of 18 V.S.A. § 9434 to a record devoid of the evidence necessary to meaningful application of the law to the facts").

¶ 39.    The same is true here. Instead of attempting to reconstruct the agency's thought process, the Board should have sought the full record before ruling on whether the rent levels were fair. The appellate review process described in Luck Bros. will work only if there is an adequate record of how the decision on appeal was reached in the agency. As tenants argue, the process as

17

it occurred here lacks the transparency necessary to determine whether it was fair. We therefore reverse and remand the Board's decision on the fairness of the rent increases for it to obtain a full and complete record from AOT and for the Board to conduct a new adjudication of the § 5(d)(6) issue consistent with this opinion. Because we reverse on this basis, we do not reach the merits of the appeal issues based on 19 V.S.A. § 5(d)(6). The merits issues should be addressed when there is a full record.

Reversed and remanded for further proceedings consistent with this opinion.

FOR THE COURT:

_____
Associate Justice (Ret.)

¶ 40. **WAPLES, J., dissenting.** Where we have "not had the benefit of briefing and argument" on an issue, we should not decide it. Favreau v. Miller, 156 Vt. 222, 233, 591 A.2d 68, 75 (1991) (Dooley, J., dissenting). The applicability of Luck Bros. to the Transportation Board's review of the fairness of rental increases under § 5(d)(6) was not raised by the parties and is not properly before us. See Luck Bros. v. Agency of Transp., 2014 VT 59, 196 Vt. 584, 99 A.3d 997. A "principal reason for not considering issues not presented by the parties at trial or in their briefs is the great risk of deciding important issues without hearing reasoned arguments on both sides of the question, especially a novel question." Bloomer v. Gibson, 2006 VT 104, ¶ 36, 180 Vt. 397, 912 A.2d 424 (Teachout, Supr. J., dissenting) (quotation omitted). Indeed, the "great risk" of error is evident here because the de novo standard established in Luck Bros. for the Board's review of contract disputes under 19 V.S.A. § 5(d)(4) should not apply to the Board's review of the fairness of rental increases under § 5(d)(6). Because the Agency of Transportation (AOT) provided an adequate explanation for the rental increases, I would affirm the Board's decision that the increase was fair. Therefore, I respectfully dissent.

18

¶ 41.   The majority decides, without the benefit of argument or briefing, that the process we described in Luck Bros. for claims arising under 19 V.S.A. § 5(d)(4) applies equally[10] to claims brought under § 5(d)(6).  See ante, ¶ 24.  I respectfully disagree.  Although § 5(d)(4) and § 5(d)(6) both empower the Board to "provide appellate review," the distinct nature of these two kinds of claims requires different approaches.

¶ 42.   In Luck Bros., a contractor appealed a dismissal of its suit by the superior court[11] against AOT for failure to exhaust administrative remedies under 19 V.S.A. § 5(d)(4).  The contractor contended before this Court that it was not required to exhaust administrative remedies because the process did not afford constitutionally required due-process protections.  Luck Bros., 2014 VT 59, ¶ 8.  Because "payment under a contract with the state is a property interest entitled to due process protections," the Court looked to the administrative procedure within AOT and before the Board to evaluate the process's compliance with constitutional requirements.  Id. ¶ 10.

¶ 43.   The Board had "struggled to construe its role under" 19 V.S.A. § 5(d)(4), so the Court "address[ed] and clarif[ied] [the Board's] standard of review" in Luck Bros.  Id. ¶ 22.  We explained that the Board "owes no deference" to an AOT decision to reject a contract claim and that the Board must "provide contractors with a nondeferential standard of review that affords due process protections."  Id. ¶ 24.  As the majority points out, we described the Board's review as "essentially de novo review."  Id. ¶ 27.  However, the Luck Bros. decision relied extensively on the nature of construction contract cases and the associated due-process interests.  Luck Bros. did not mention the other statutory provisions governing the Board's appellate review of other AOT

---

[10]  The majority does not explain why it is able to review the Board's conclusion about the proper interpretation of a contract under § 5(d)(4) but not the Board's conclusions under § 5(d)(6), even though the Board failed to follow the Luck Bros. de novo review process for both questions.

[11]  At the time of Luck Bros., 19 V.S.A. § 5(c) provided that all "[f]inal orders of the Board may be reviewed on the record by a [s]uperior [c]ourt."  See 2015, No. 167 (Adj. Sess.), § 6.  The statute now provides for review "on the record by the Supreme Court."  19 V.S.A. § 5(c).

actions. We even explicitly described its holding as announcing the "standard of review of an agency's informal dispute-resolution decision" as contrasted with the standard of review for a decision in which "agencies are legislatively authorized to deal with matters within their specialized expertise," such as decisions made by AOT about rents and fees. Id. ¶ 29.

¶ 44. Section 5(d)(6) authorizes the Board to "provide appellate review when requested in writing, regarding the fairness of rents and fees charged for the occupancy or use of State-owned properties administered" by AOT. As the majority correctly notes, "fairness of rents and fees" is essentially a nonstandard. See ante, ¶ 13 n.6. And again, as noted by the majority, the party best suited to make policy determinations over "fairness of rents and fees" is AOT. See GP Burlington S., LLC v. Dep't of Taxes, 2010 VT 23, ¶ 15, 187 Vt. 421, 996 A.2d 180 ("It is critical that the administrative agency with legislative authorization and specialized expertise to oversee technical subject areas such as these be given deference with respect to policy-driven decisions.").

¶ 45. State statute gives AOT the authority to lease space for the construction of airport hangars. 5 V.S.A. § 807. Pursuant to that power, AOT entered agreements with the tenants here. Those leases allow AOT to adjust the rental rates based on CPI-U, current market value for the land, and the maintenance costs for the airports. Thus, the statutes require us to balance two competing mandates. On the one hand, AOT is authorized to enter leases and set rents. And on the other hand, 19 V.S.A. § 5(d)(6) gives the Board authority to "provide appellate review" of the "fairness of rents and fees." As noted by AOT before the Board, tenants' claims regarding the fairness of their rents fall squarely within the scope of § 5(d)(6) review. The majority's new requirement that the Transportation Board hold a "de novo" hearing and apply a "nondeferential" standard of review for appeals brought to contest the "fairness of rents and fees" does not effectuate the statutory language that gives AOT authority to establish contract terms and set policy for rental rate increases.

20

¶ 46. Though the majority instructs the Board to adjudicate the § 5(d)(6) issue "consistent with this opinion," it does not explain how the Board is to proceed "de novo" for a claim about fairness of rents other than asking whether the agency's action was arbitrary and capricious—fundamentally <u>not</u> a de novo review. A "de novo, nondeferential standard of review" on an appeal over the fairness of rents requires the Board to hear evidence and decide whether rents are fair, substituting its judgment for that of AOT. See <u>ante</u>, ¶ 24 (concluding that standard of review for § 5(d)(6) claims is that described in <u>Luck Bros.</u>); <u>Luck Bros.</u>, 2014 VT 59, ¶¶ 26, 29, 30 (explaining that the Board's review is not limited "to the record produced" by AOT for the Board to "make an informed decision"). But the majority also explains that the Board needed "the full record before ruling on whether the rent levels were fair." See <u>ante</u>, ¶ 39. The majority even explains that AOT's failure to provide a full record is the reason it remands this matter to the Board. See <u>ante</u>, ¶ 28. The majority seems to require the Board, even after it has the full agency record, to nevertheless take de novo testimony on the fairness of rents and fees without respect to the record. It makes more sense for the Board to review the agency record and decide if the agency's decision to raise rents is supported than for the Board to create a new record to decide, de novo, whether the fees and rents are fair.

¶ 47. To give effect to AOT's authority over these matters, an appeal of the "fairness of rents and fees" should proceed, as happened here, with a review of the record from AOT to determine whether the new rent or fee is supported by the record. The evaluation of "fairness" in this context requires a determination of precisely what was argued by tenants both before the Board and on appeal here: whether the record from AOT supports its actions. Indeed, as the majority notes, 19 V.S.A. § 5(h) provides that AOT must provide its "record of decision" to the Board to provide the basis of the appeal. This is a familiar requirement and standard of review in administrative law. See, e.g., <u>Chittenden Cnty. Sheriff's Dep't v. Dep't of Lab.</u>, 2020 VT 4, ¶ 16, 211 Vt. 377, 228 A.3d 85 (explaining that "administrative decisions arrived at without reference

21

to any standards or principles are arbitrary and capricious, and that such . . . decision-making denies . . . due process of law" (quotation omitted and alteration)).

¶ 48. Unlike an appeal under § 5(d)(4), an appeal to the Board under § 5(d)(6) need not proceed with a "de novo hearing" because a review of an agency decision for its "fairness" solely requires the Board to evaluate whether the decision is supported by the record. Before the Board, tenants squarely presented their claim that AOT's decision to raise the rents was unsupported by the record provided and thus AOT's rate decision was arbitrary and capricious. Tenants repeated these arguments on appeal here. Contrary to the majority's assertion that tenants misunderstood the requirements of Luck Bros. and how their appeal to the Board should proceed, tenants correctly understood the process by which the Board was to evaluate the "fairness of rents and fees" under § 5(d)(6).

¶ 49. The majority's analysis was not raised before the Board. The majority recites our preservation rule—that tenants must "present the issue to the administrative agency with specificity and clarity in a manner which gives the agency a fair opportunity to rule on it"—but does not fairly apply the standard. See ante, ¶ 31 (citing Pratt v. Pallito, 2017 VT 22, ¶ 16, 204 Vt. 313, 167 A.3d 320 (quotation and alteration omitted)). It is inappropriate for courts to "recite a batch of verbiage and then pay no attention to what it has said in determining what to do." Plum Creek Maine Timberlands, LLC v. Vt. Dep't of Forests, Parks & Recreation, 2016 VT 103, ¶ 51, 203 Vt. 197, 155 A.3d 694 (Dooley, J., dissenting) (quotation and alteration omitted). Before the Board, tenants did not mention Luck Bros., did not ask for a de novo hearing, and did not raise any questions about the appropriate standard for the Board's review. All along, tenants argued that AOT's decision to raise the rents was not supported by the record presented to the Board and was arbitrary and capricious. That argument presumes, correctly, that the Board's review should be limited to the AOT's "record of decision." 19 V.S.A. § 5(h). The majority remands for the Board to seek a "full record" because it thinks that the record AOT provided to the Board cannot support

the Board's affirmance of AOT's decision to raise rental fees. See ante, ¶ 39. This inappropriately substitutes this Court's judgment about the sufficiency of the record for that of the Board.

¶ 50. The Board determined that the record provided to it, even if it was not a "full record," sufficed to support AOT's decision. I agree with the majority that the Board had the power to hold an evidentiary hearing to capture a more complete record under 19 V.S.A. § 5(f). The Board agreed too. It repeatedly invited "arguments that the records produced by AOT [were] insufficient to resolve these disputes and that an evidentiary hearing [was] necessary." The parties repeatedly declined these invitations and relied instead on the written record.

¶ 51. The role of the Board thus was to determine whether the record AOT proffered sufficed to explain its decision to increase the rental rates at the state airport hangars. Our precedent sets forth what is required to satisfy such review. Only decisions "arrived at without reference to any standards or principles are arbitrary and capricious." Chittenden Cnty. Sheriff's Dep't, 2020 VT 4, ¶ 16; see also 3 V.S.A. § 801(b)(13) (providing that agency action is arbitrary if it lacks a factual basis or if it is "not rationally connected to the factual basis asserted").

¶ 52. After reviewing the record and the parties' filings,[12] the Board found that AOT "sufficiently demonstrated that the rent increases were based on the proper factors," after AOT conducted "an analysis of current market value and maintenance costs, as well as the CPI-U, and adjusted renewal rates according to those factors." This finding[13] comports with the review

---

[12] AOT, in support of its argument before the Board, attached as an exhibit "pre-filed direct testimony" of an AOT employee, Trini Brassard. Tenants objected to the Board considering the information contained in Ms. Brassard's "pre-filed testimony" as both created after the fact and thus not a legitimate part of the administrative record and as not timely filed in accord with the April 3, 2023 deadline for submission of the administrative record. The Board, in its decision, explained that the testimony was "not significant to [its] decision." On appeal, tenants take issue with the contents of the testimony but not with its presence. I do not consider the testimony here.

[13] The majority intimates that the Board could not have made findings without holding an evidentiary hearing. See ante, ¶ 6 n.3. This is not so. Both the Board and the parties characterized the Board's review as that of summary judgment. We have explained that a court's summary

23

required. The Transportation Board found that AOT's rental increase was based on appropriate factors and was arrived at with reference to some standards or principles. See Chittenden Cnty. Sheriff's Dep't, 2020 VT 4, ¶ 16. Thus, the Board concluded that AOT's decision was not arbitrary or capricious, exercising its power under 19 V.S.A. § 5(d)(6).

¶ 53. The arguments that tenants preserved for appeal were whether the AOT decision was arbitrary and capricious and whether the Board erred in its conclusions. We will affirm the Board's "findings as long as they are supported by substantial evidence, and its conclusions if rationally derived from the findings and based on a correct interpretation of the law." Braun v. Bd. of Dental Exm'rs, 167 Vt. 110, 114, 702 A.2d 124, 126 (1997). We will not substitute our own judgment for that of the Board. Id. at 114, 702 A.2d at 127.

¶ 54. I agree with the Board that the evidence presented by AOT in defense of its decision to raise the rent was sparse, and that AOT would be better served by providing "a more clear and direct analysis showing the relationship between its rate increase and the factors on which it relied for that rate increase" in the future. Indeed, on appeal here, counsel for AOT even stated that there was a "less than ideal written articulation of AOT's method in the administrative record." Nonetheless, AOT points to several spreadsheets in its administrative record to support the Board's findings. In one spreadsheet, AOT detailed rates at other airports with various categories of comparison, including location, runway length, lights, and other amenities. In another, AOT detailed the various "market values of the airport." AOT's record also provided evidence of what percentage of the airport expenditures were covered by lease revenue. AOT's analysis of the various comparator properties was completed prior to the rate increase and was presented to the Aviation Advisory Council for review.

---

judgment decision necessarily finds facts—uncontested facts—to determine whether the movant is entitled to judgment. Crosby v. Great Atl. & Pac. Tea Co., 143 Vt. 537, 539, 468 A.2d 567, 569 (1983). We have even encouraged "trial courts to include such findings with an order granting summary judgment to facilitate appellate review." Id.

¶ 55. This evidence, which was presented to the Board, demonstrates that the Board's findings—that AOT's rent increase was not arbitrary or capricious—are supported by substantial evidence. Braun, 167 Vt. at 114; 702 A.2d at 126. Tenants argue that AOT was required to produce a mathematical basis linking the percentage increases in lease rates with demonstrable increases in the lease factors. On the contrary, all that was required of AOT was to consider some set of standards or principles in increasing the rent, pursuant to the limitations of the leases. AOT did so here. The Board's conclusion that AOT did not act arbitrarily was thus "rationally derived from [its] findings and based on a correct interpretation of the law." Id. There is no reason to disturb its conclusion.

¶ 56. The majority is independently looking to the record and deeming it incomplete. See ante, ¶ 37 (describing the record produced as "incomplete"). The majority thus substitutes its own judgment for that of the Board, which contravenes our standard of review. Braun, 167 Vt. at 114, 702 A.2d at 127. The majority relies on Conservation Law Foundation v. Burke to argue that the Board "should have ordered the agency to present more evidence." See ante, ¶ 37 (citing Burke, 162 Vt. 115, 128, 645 A.2d 495, 503 (1993)). In Burke, a company seeking a permit to operate a medical-waste incinerator appealed a decision of the superior court which reversed an agency decision and denied the company's request for a permit. Id. at 117-18, 645 A.2d at 497. In that case, the record supplied by the agency contained "no document earlier than the proposed permit." Id. at 127, 645 A.2d at 503. We concluded that the trial court properly declined to consider the agency's record comprised solely of "post hoc justification," but also concluded that the trial court erred in denying the permit rather than seeking a more complete version of the record or remanding for further agency consideration. Id. at 128-29, 645 A.2d at 503. We ordered a remand to allow "the agency to cure the deficiency" of an inadequate record to support its action. Id. at 128, 645 A.2d at 503.

¶ 57.  Burke is inapposite to the facts here.  In this case, the Board found that AOT "sufficiently demonstrated that the rent increases were based on the proper factors."  There is no need for this Court to order the lower tribunal to seek a more complete record because here, unlike in Burke, the record included files that pre-date AOT's decision to increase rents and the lower tribunal found that the record put forward by the agency supported its action.  Simply put, the Board did not identify that the agency record was too deficient to support AOT's decision to raise rents, so there is no need for a remand.  The other cases cited by the majority similarly do not support a remand.  Both other cases cited did not involve an appeal from a Board hearing a claim arising from an agency; rather, the cases involved appeals in different procedural postures.  See GP Burlington S., 2010 VT 23, ¶ 15-16 (remanding superior court decision to Commissioner of department); Brattleboro Mem'l Hosp. v. Dep't of Banking, 172 Vt. 630, 631, 782 A.2d 1217, 1219 (2001) (mem.) (remanding decision of Commissioner back because we could not "determine from the record before us" whether Commissioner's decision was adequately supported).

¶ 58.  Because the agency record supports the Board's decision, I would affirm and therefore respectfully dissent.

_____
Associate Justice